635 So.2d 845 (1994)
Jimmy Dale KEYS
v.
STATE of Mississippi.
No. 91-KA-00435.
Supreme Court of Mississippi.
March 31, 1994.
*846 En Banc.
McRAE, Justice, for the court:
Jimmy Dale Keys perfects this appeal from his conviction of manslaughter entered in the Circuit Court of the First Judicial District of Harrison County, Mississippi, following Keys' indictment and trial for murder. Keys was sentenced by the lower court to serve a term of fifteen (15) years in the custody of the Mississippi Department of Corrections. His motion for a new trial having been denied, he initiated this appeal raising the following issue:
The trial court erred in granting Instruction S-10, a non-conventional "arming" instruction that deprived Keys of the right to claim self-defense.
We find that the trial court improperly granted Instruction S-10, and, accordingly, reverse and remand for a new trial.

FACTS
During the nighttime hours of April 30, 1990, Jimmy Keys shot and killed James Cunningham at the corner of South Carolina Avenue and Martin Luther King Drive in north Gulfport. At the time of the shooting, Keys was a tall, slender seventeen-year old while Cunningham was a twenty-five-year-old muscular adult.
The defendant and victim had played a game of basketball with other young men on the afternoon of the shooting. During the course of the game, Keys blocked one of Cunningham's shots, causing Cunningham to fall hard to the ground. Cunningham jumped up from the ground and slapped Keys' face. No words were exchanged at this time, and both parties left. According to Keys, he retreated to his grandmother's house where he resided because he was afraid of Cunningham.
Keys testified that a short time later, Cunningham stood outside Keys' house, calling him foul names and inviting him to come outside. This testimony was corroborated by other Keys family members who observed Cunningham outside their home. Defendant and Richard Butler, defendant's step-grandfather, also testified they observed a gun in the back of Cunningham's pants. Other defense *847 witnesses testified Cunningham had a reputation for violence.
Later that evening around 11:00 p.m., Keys was sent to the store by a family member. Keys testified that he took a pistol with him because having previously been a victim of a robbery, he was fearful of being robbed again. Keys denied he armed himself for the purpose of seeking out Cunningham with the intent to shoot him. Keys first walked to the house of his friend Antonio Magee. Magee testified that around 5:30 or 6:00 p.m. Cunningham came by his house looking for Keys. Cunningham threatened to shoot Magee if he did not allow him inside to look for Keys. This information was communicated to Keys prior to the homicide. Magee testified that he admonished Keys not to take the pistol but Keys carried it anyway just in case Cunningham had his own pistol and wanted to start difficulty. Keys asked Magee and several others present at Magee's home to accompany him to the store.
As they walked toward the store, one of the young men noticed Cunningham standing on the street corner. Keys testified that he stopped, turned around and started to retreat. When Cunningham saw Keys, he asked Keys if Keys was ready to "straighten out his business." Keys did not reply but backed up once again. Cunningham then inquired a second time, "Bitch, are you ready to straighten your business, you got your pistol with you now?" According to Keys, Cunningham had reached behind his back and was walking toward Keys at the time he made the latter statement. Keys shot Cunningham because he thought Cunningham, whose arm was in motion out from behind his back, was going to shoot and kill him. Magee corroborated Keys' testimony that Cunningham was reaching behind his back when he addressed Keys as a "bitch."
The testimony, however, is patently conflicting on the question of self-defense. Rodney Riley, a friend of Cunningham's, was an ear and eyewitness to the shooting. Riley testified that a man to whom Cunningham owed money was approaching from one direction while Keys and his friends were approaching from the other. According to Riley, Cunningham reached into his pocket for some money when the other man asked Cunningham to repay him. After paying this man, Cunningham turned and confronted Keys, who was approaching with both hands inside his pockets. Cunningham then asked Keys why Keys was following him and was he ready to "straighten his business." Riley testified that when Cunningham said this, the defendant pulled a pearl-handled .22 pistol out of his coat pocket. Riley asked Keys why he wanted to shoot a man over a basketball game that occurred hours before. Keys retorted, "Nobody slaps me, I'm going to kill him." Keys then fired twice at Cunningham. Riley testified that Cunningham did not have a gun and made no threats. No weapons were recovered from the victim or observed near or around the body.
Another witness to the homicide, Emmett Polk, corroborated Riley's testimony that Cunningham did not take any steps in Keys' direction and made no movements or provoking gestures towards Keys. Polk testified that the victim was simply counting money held in his hands.
The defendant claims he attempted to retreat after spotting Cunningham on the corner but that Cunningham resumed the difficulty with words and an overt gesture. Keys contends that because of the prior altercation with Cunningham and Cunningham's prior communicated threats, he had every reason to fear Cunningham. Keys argues that when Cunningham mouthed off at him and reached behind his back, he had every right to react in self-defense. There is ample testimony from which a reasonable, hypothetical juror could conclude this was true.
The State, on the other hand, contends that Keys armed himself when he was in no danger and went looking for Cunningham with the intention of shooting him in retaliation for the slapping incident. Giving the State the benefit of all the evidence adduced in its favor, and squeezing all favorable inferences from the evidence, there is ample testimony from which a reasonable, hypothetical juror could infer this also was true.
Only one issue is raised on appeal. Keys complains that the granting, over his vigorous objection, of jury Instruction S-10, a *848 non-conventional "arming" instruction, deprived him of the right to self-defense.

LAW
A criminal defendant is entitled to present his defense to the finder of fact. This Court has condemned outright the granting of any instruction that precludes a defendant from asserting a claim of self-defense. See McMullen v. State, 291 So.2d 537 (Miss. 1974); Patrick v. State, 285 So.2d 165 (Miss. 1973); Craft v. State, 271 So.2d 735 (Miss. 1973); Ellis v. State, 208 So.2d 49 (Miss. 1968); Tate v. State, 192 So.2d 923 (Miss. 1966); Thompson v. State, 190 Miss. 639, 200 So. 715 (1941); Brown v. State, 186 Miss. 734, 191 So. 818 (1939); Vance v. State, 182 Miss. 840, 183 So. 280 (1938); Coleman v. State, 179 Miss. 661, 176 So. 714 (1937); Lee v. State, 138 Miss. 474, 103 So. 233 (1925); Adams v. State, 136 Miss. 298, 101 So. 437 (1924); Garner v. State, 93 Miss. 843, 47 So. 500 (1908); Pulpus v. State, 82 Miss. 548, 34 So. 2 (1903); Lofton v. State, 79 Miss. 723, 31 So. 420 (1902); and Prine v. State, 73 Miss. 838, 19 So. 711 (1896). In this case, that right was impaired, if not completely cut off, by jury instruction S-10 which reads as follows:
The Court instructs the Jury that if you believe from the evidence in this case, beyond a reasonable doubt, that the Defendant, Jimmy Dale Keys, armed himself with a deadly weapon and confronted James Cunningham with the formed felonious intention of invoking a difficulty with James Cunningham, or brought on or voluntarily entered into any difficulty with James Cunningham with the felonious intent to cause serious bodily harm to James Cunningham, then the Defendant, Jimmy Dale Keys, cannot invoke the law of self-defense no matter how imminent the peril in which Jimmy Dale Keys found himself.
After the jury had been instructed in four other jury instructions on the law of self-defense, the S-10 charge informed the fact finder that Keys, no matter how imminent the danger, could not plead self-defense if he (1) armed himself with a deadly weapon and either (2)(a) confronted Cunningham with the formed felonious intention of causing a difficulty with the deceased or (2)(b) brought on or voluntarily entered into any difficulty with Cunningham (3) with the felonious intent to cause serious bodily harm to Cunningham.
On appeal, Keys claims that instruction S-10, a so-called "arming" instruction, is erroneous because it allowed the jury to discount the defendant's theory that he shot Cunningham in self-defense after Cunningham "mouthed off" and made a movement behind his back with his hand. It is uncontradicted that Cunningham "mouthed off" at Keys and that Cunningham's hands were in motion even if, in truth, he was only counting his money.
Defense counsel specifically objected to the S-10 charge, claiming the instruction would confuse and mislead the jury on the crucial point of self-defense. He argued that the instruction left no room for the possibility that Keys could have had the necessary felonious intent to harm Cunningham but at the moment before the incident occurred, changed his mind and attempted to retreat. He lastly argued that the jury had sufficiently instructed on the law regarding murder and manslaughter. Under the facts of this case, we think that Keys' contemporaneous objection is both on time and on target. We agree with Keys this is a classic case of self-defense and that the jury was more than amply instructed on the law of murder, manslaughter, and self-defense.
The jury received four murder instructions. These instructions defined murder, deliberate design, intent and permitted an inference of intent from the use of a deadly weapon. In addition four self-defense instructions were granted. These instructions (1) required an overt act from the deceased; (2) recited the reasonable and prudent man standard; (3) included the model self-defense instruction found in Robinson v. State, 434 So.2d 206, 207 (Miss. 1983) and (4) told the jury that Keys was justified in carrying a concealed weapon if his life had been threatened and he had good and sufficient reason to fear a serious attack from the enemy. Lastly, the manslaughter instruction informed the jury the homicide was manslaughter if the defendant acted under the *849 belief of necessity without reasonable cause therefor. See Cook v. State, 467 So.2d 203, 207 (Miss. 1985).
Jury Instruction S-10 was neither necessary nor useful. Given the generous supply of self-defense, murder, and manslaughter instructions, S-10 was potentially confusing to the jury. Moreover, the testimony of Keys could support either a finding that Keys never entertained an intent to cause bodily harm to Cunningham or that he made a good faith effort to retreat from his encounter with Cunningham abandoning his original purpose and intent. Even if the great weight of the evidence against Keys supports a contrary view, Keys is still entitled to present his defense to the jury unimpaired by instructions similar to S-10 which preclude his right to self-defense.
Most importantly, instruction S-10 in effect is a peremptory instruction for the prosecution. Instructions such as S-10 place a higher burden on a defendant to assert a claim of self-defense than is required by our law. It allows certain parts of the evidence to be considered while omitting other parts advantageous to the defendant's case. This Court began its condemnation of such instruction almost a century ago when it held:
The fourth instruction is unfair to the prisoner, in that it singles out certain parts of the evidence for prominent presentation to the jury, and omits other parts favorable to the accused.
Prine v. State, 73 Miss. 838, 19 So. 711, 712 (1896). This type of instruction has repeatedly been denounced. See Thompson v. State, 602 So.2d 1185 (Miss. 1992); Williams v. State, 482 So.2d 1136 (Miss. 1986); Barnes v. State, 457 So.2d 1347 (Miss. 1984); McMullen v. State, 291 So.2d 537 (Miss. 1974); Patrick v. State, 285 So.2d 165 (Miss. 1973); Craft v. State, 271 So.2d 735 (Miss. 1973); Ellis v. State, 208 So.2d 49 (Miss. 1968); Tate v. State, 192 So.2d 923 (Miss. 1966). See also Thompson v. State, 190 Miss. 639, 200 So. 715 (1941); Brown v. State, 186 Miss. 734, 191 So. 818 (1939); Vance v. State, 182 Miss. 840, 183 So. 280 (1938); Coleman v. State, 179 Miss. 661, 176 So. 714 (1937); Lee v. State, 138 Miss. 474, 103 So. 233 (1925); Adams v. State, 136 Miss. 298, 101 So. 437 (1924); Garner v. State, 93 Miss. 843, 47 So. 500 (1908); Pulpus v. State, 82 Miss. 548, 34 So. 2 (1903) and Lofton v. State, 79 Miss. 723, 31 So. 420 (1902).
It is fundamentally unfair to deny the jury an opportunity to consider the defendant's defense where, as here, there is testimony to support his theory of self-defense. Testimony revealed that: (1) earlier that day he suffered an assault at the hands of the victim; (2) threats were made to Keys, as well as to others, by Cunningham; (3) Keys and others had seen Cunningham with a gun tucked behind his pants; (4) Keys knew of Cunningham's reputation for violence; (5) at the scene of the incident, Keys started to retreat; (6) Keys aborted his retreat when Cunningham renewed the difficulty by mouthing off at Keys, and (7) Cunningham was doing something with his hands. This is a case, however, containing disputed facts regarding Keys' self-defense, and this issue can and should be presented to the jury by conventional self-defense instructions. S-10 was inappropriate under the facts of this case because it cut off the jury's consideration of self-defense. The granting of Instruction S-10 constitutes reversible error, and our decision today should clearly indicate that we look with disfavor on instructions such as S-10 and they should rarely be used. Therefore, this case is reversed and remanded for a new trial on the merits.
REVERSED AND REMANDED.
DAN M. LEE and PRATHER, P.JJ., and SULLIVAN and PITTMAN, JJ., concur.
PRATHER, P.J., concurs with separate written opinion joined by HAWKINS, C.J., and BANKS, JAMES L. ROBERTS, Jr. and SMITH, JJ.
BANKS, J., concurs in part with separate written opinion, joined by PRATHER, P.J., and JAMES L. ROBERTS, Jr., J.
PRATHER, Presiding Justice, concurring:
I concur with the majority's conclusion that this case must be reversed and remanded for a new trial because the so called "arming" instruction should not have been *850 given. However, I write separately to express my view.
In the case sub judice, the "arming" instruction, S-10, was not warranted under the facts. Keys' testimony could support a finding that he never entertained an intent to cause Cunningham bodily harm or that he made a good faith effort to retreat from Cunningham, abandoning his original intent to cause harm. In contrast, the facts in Hart v. State, No. 91-KA-0195 (decided 2/24/94), warrant the type of "arming" instruction found erroneous in the instant case.
In Hart, there was no evidence that the defendant, after arming himself and driving to the victim's home, later changed his mind and abandoned his original intent to cause harm, or that he attempted to retreat from the encounter with the victim. Even the defendant's testimony revealed that he was the aggressor from beginning to end. On these facts, as found by the majority in Hart, the "arming" instruction is proper.
As noted in Hart, it is a rare case whose facts will support an "arming" instruction such as that at issue. The case at bar is not in such limited company. The distinguishing facts of the two cases dictate opposite results.
HAWKINS, C.J., and BANKS, JAMES L. ROBERTS, Jr. and SMITH, JJ., join this opinion.
BANKS, Justice, concurring:
I write to note my agreement with Justice Prather that this case is correctly reversed and remanded and is distinguished from Hart v. State, where the instruction here complained of was appropriately used. I take this opportunity, also, to further explicate my views concerning this instruction.
First the instruction in question does not, as the majority suggests, take away the right to claim self-defense. What the instruction does do, as instructions should do, is define circumstances under which the rational fear of imminent harm to oneself does not excuse "defensive" action. That circumstance is one in which one deliberately provokes the imminent danger with the intent of harming the person provoked. The instruction does no more than tell the jury that one who calls another out to kill him is not excused by virtue of the fact that he induced the victim to act first. The instruction does not stand for the proposition that any one who provokes a difficulty is deprived of the defense of self-defense. The instruction requires a finding of a predetermined specific intent.
Consider for a moment what the jury faces in seeking to apply only our traditional self-defense instruction.
The court instructs the jury that the killing of a human being is justified if the defendant was acting in necessary self-defense because he had reasonable grounds to fear under all the circumstances in evidence that he was in danger of great personal injury and that there was imminent danger of such bodily harm occurring.
Butler v. State, 544 So.2d 816, 818 (Miss. 1989). The slight redundancy and abstractness aside, the above is a typical self-defense instruction. See also, Davis v. State, 376 So.2d 1079, 1080 (Miss. 1979). The only question for the jury to answer would be whether at the time of the homicide the defendant reasonably apprehended imminent physical harm at the hands of the victim. Where the facts show that he was facing serious injury at the time that he inflicted deadly harm and the instruction does not compel the jury to regard the events that precipitated the situation, the jury is constrained by the instruction to find self-defense. Thus the "quick draw" artist, or even the ambusher, who takes the time to yell "slap leather, partner" goes on to kill again. That is not, and should not, be the law. We outlawed dueling long ago, Mississippi Constitution, Art. 3, § 19 (1890), and anyone killing another in a duel is guilty of murder.
The instruction here criticized by the majority correctly focuses the jury's attention upon events preceding the fatal moment. It pronounces law to the effect that one who deliberately invites the threat to himself in order to kill another is not excused for the killing by virtue of that threat. That is good *851 law. It is law that the jury should know in the proper case.
PRATHER, P.J., and JAMES L. ROBERTS, Jr., J., join this opinion.